In re Frank BERTUCCIO, Debtor.

Frank Bertuccio, Plaintiff,

v.

California State Contractors License Board, et al., Defendants.

Bankruptcy No. 04–56255.
Adversary No. 04–5524.

United States Bankruptcy Court,
N.D. California.

Dec. 31, 2008.

Cathleen Cooper Moran, Renee C. Mendoza, Moran Law Group, Inc., Mountain View, CA, for Plaintiff.

Maretta D. Ward, Deputy Atty. General, CA Dept. of Justice, San Francisco, CA, Marguerite C. Stricklin, Office of the Attorney General, Oakland, CA, for Defendants.

## DECISION IN PART ON DEBTOR'S ACTION FOR DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

On November 11, 2004, Debtor Frank Bertuccio ("Debtor") filed a Complaint for Preliminary Injunction and Declaratory Relief ("Complaint") against Defendants California State Contractors License Board ("CSLB"), the California State Employment Development Department ("EDD"), Stephen P. Sands as the Registrar of the CSLB ("Sands") and Sally McKeag as the Chief Deputy Director of the EDD ("McKeag")(collectively, "Defen-

dants"). The Complaint alleges that the Defendants willfully violated the automatic stay by failing to timely reinstate the Debtor's contractor's license upon notice of his bankruptcy filing. The Debtor seeks actual and exemplary damages against the Defendants pursuant to Bankruptcy Code § 362(h).[1]

Debtor is represented by Cathleen Cooper Moran, Esq. of the Moran Law Group. Defendants Sands and the CSLB (hereinafter, collectively, the "CSLB" unless otherwise specified) are represented by Maretta D. Ward, Esq., Deputy Attorney General for the State of California. Defendants McKeag and the EDD (hereinafter, collectively the "EDD" unless otherwise specified) are represented by Marguerite C. Stricklin, Esq., Deputy Attorney General for the State of California.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

On or about October 14, 1994, the Debtor applied with the CSLB for a flooring and floor covering contractor's license.[2] On March 30, 1995, the CSLB issued a contractor's license to the Debtor, as a sole owner business, under the business name of European Hardwood Floors Design & Interiors.[3] Between May 2, 2000 [4] and April 23, 2003, the Debtor changed the name of his business in the records of the CSLB three times.[5]

1. Unless otherwise provided, all references to code sections shall mean the Bankruptcy Code, codified in Title 11 of the United States Code, 11 U.S.C. § 101, et seq., including all amendments thereto, as applicable at the time this Adversary Proceeding was filed on November 1, 2004.

2. Trial Exhibit U. The exhibits admitted at trial were submitted by the parties on a joint basis. The parties stipulated on the record to the admission of Trial Exhibits A–V.

3. Trial Exhibits A, N and O.

4. On May 2, 2000, the Debtor changed the name of his business, in the records of the CSLB, to "Statewide Professional Services/European Hardwood Floors." Statewide Professional Services, Inc. was later incorporated by the Debtor on September 6, 2001 ("Statewide"). Trial Exhibit B. Statewide's corporate status was suspended on July 21, 2004. Id.
 On November 7, 2005—roughly one month after the Debtor filed his Chapter 13 petition and a few days after the filing of this Adversary Proceeding—Statewide filed its own Chapter 7 petition. The Debtor signed Statewide's petition as its President and authorized agent. Statewide's schedules indicate that the Debtor's "new corporation" "European

Floor Coverings" purchased most of Statewide's assets. Statewide's Schedule E lists a $37,514.00 debt owing to the EDD. No proof of claim was filed by the EDD in Statewide's case. Statewide's Schedule E showed total unsecured priority debts of $131,983.00. Statewide had no secured debts and only $72,156.36 in general unsecured debts. Statewide's Statement of Financial Affairs indicates that the EDD seized approximately $68,000 from Statewide's accounts between 2002 and 2005. A Final Decree was entered in Statewide's bankruptcy case on February 21, 2006.
 In the Debtor's instant bankruptcy case, the EDD filed a claim in total amount of $12,-385,34 for the tax period from April 1, 2001 through September 30, 2001, asserting a priority as to $11,797.22 of that amount. Trial Exhibit J. The tax period covered by this claim was prior to the incorporation of Statewide by the Debtor on September 6, 2001, and, therefore, presumably while the Debtor was operating his business as a "sole owner."

5. EDD's Closing Post Trial Brief, Attachment 1. This attachment is the May 1, 2008 Decision by the CSLB (the "CSLB Decision"). The CSLB Decision references and attaches the April 14, 2008 Proposed Decision by Administrative Law Judge Melissa G. Crowell

On April 10, 2003, the Debtor signed an application with the CSLB to change the business' status to a corporation with the name of European Hardwood Floors Design and Interiors.[6] It is unclear, from the evidence currently before this Court, whether this April 2003 application was ever granted.[7] The California Secretary of State has no record of any corporation named European Hardwood Floors Design and Interiors.

On June 25, 2003, the EDD advised the CSLB that the Debtor was in violation of state law for failing to pay taxes in the amount of $34,517.46.[8] This tax liability is based on an uncontested audit by the EDD, for the period beginning January 1, 1999 through September 30, 2001.[9] On June 26, 2003, the CSLB sent a letter to the Debtor advising him of his default with the EDD and the potential suspension of his license if the default was not corrected.[10] On August 26, 2003, the CSLB suspended the Debtor's contractor's license for failing to resolve the outstanding 2001 tax liability owing to the EDD, in accordance with California Business and Professions Code § 7145.5.[11]

While his contractor's license was suspended, the Debtor continued to operate his business. At trial, the Debtor insisted that he only continued that portion of his business related to the sale of flooring materials, for which the Debtor contends a contractor's license was not needed.[12] The evidence shows, however, that in early October 2004, while the Debtor's contractor's license was suspended, he entered into

(the "Proposed Decision"). A complete copy of the CSLB Decision, with the attached Proposed Decision, is attached as Attachment 1 to EDD's Closing Post Trial Brief. A complete copy of the CSLB Decision, with the attached Proposed Decision, is also included as Exhibit B to the Chamber's Copy of the Request for Judicial Notice Pursuant to 28 U.S.C. Section 201, filed by the CSLB on June 25, 2008 (the "Request for Judicial Notice"). However, the electronically-filed version of the Request for Judicial Notice posted on the Court's docket does not include the Proposed Decision. Assuming that the copy served on the parties included the Proposed Decision, counsel for the CSLB should correct the version posted on the Court's website to also attach the Proposed Decision. For the sake of clarity in the meantime, when referencing the CSLB Decision, the Court will cite to Attachment 1 of EDD's Closing Post Trial Brief since the electronically-filed version of this document includes the Proposed Decision.

6. EDD's Closing Post Trial Brief, Attachment 1.

7. Staci Pugh of the CSLB testified at trial that this application was "returned because we needed additional information regarding corporate titles and because the EDD liability needed to be complied with." Trial Transcript, Vol. II, 37:9–11. However, the Proposed Decision issued by Administrative Law Judge Melissa G. Crowell indicates that on April 23, 2003, the CSLB granted this application for a corporate license. EDD's Closing Post Trial Brief, Attachment 1.

8. Trial Exhibit E.

9. Trial Transcript, Vol. I., 45:12–24 and Trial Exhibits C and D.

10. Trial Exhibit E.

11. Trial Exhibit F.

12. Trial Transcript, Vol. I., 12:13–22. The Debtor testified at trial that 20–30% of his business was attributable to the sale of flooring material without associated installation. Trial Transcript, Vol. I., 20:3–6. The Debtor further testified at trial that, just prior to the suspension of his contractor's license in the Summer of 2003, the installation portion of his business realized about $50,000/month in gross sales. Trial Transcript, Vol. I, 21:3–5. Of this gross amount, the cost to the Debtor for the labor and materials was approximately $10,000. Trial Transcript, Vol. I, 21:10–12, 23:5–8. Prior to the suspension of his contractor's license, the Debtor grossed roughly $10,000–$15,000/month from material sales. Trial Transcript, Vol. I., 25:10–12.

contracts for the installation of hardwood flooring with at least two parties.[13] The Debtor testified that he entered into the contracts in question believing that his contractor's license would be reinstated—in light of his Chapter 13 bankruptcy filing—in sufficient time to perform the installations called for in the contracts.[14]

The contracts in question were initially brought into evidence by the Debtor as evidence of the alleged damages he sustained as a result of the Defendants' failure to timely reinstate his contractor's license.[15] As further evidence of the damage he incurred from not having his contractor's license, at trial the Debtor submitted copies of his business' phone log of calls from potential customers between October 8, 2004 and October 30, 2004.[16]

On October 7, 2004, the Debtor filed a Chapter 13 bankruptcy petition. On October 8, 2004, the Debtor's counsel provided actual notice to the CSLB of the Debtor's bankruptcy filing via facsimile and asked that the Debtor's license be reinstated.[17] On October 14, 2008, the CSLB relayed this information to the EDD.[18] The EDD declined the request by the CSLB for permission to lift the suspension of the Debtor's contractor's license.[19] On October 18, 2004, the Debtor's counsel called the EDD directly and again requested a release of the Debtor's license. In response, the EDD's representative asked if the Debtor's Chapter 13 plan required the use of his contractor's license.[20] The EDD has argued that "[s]ince the debtor had continuously received earnings during the period his contractor's license was suspended, it was not clear to EDD that the debtor needed the license to fund the plan."[21] On October 22, 2004, the EDD

13. Trial Exhibits P, Q and R.

14. Trial Transcript, Vol. I, 27:7–28:5.

15. Declaration of Frank Bertuccio in Support of Motion for Preliminary Injunction, filed by the Debtor on November 9, 2004.

16. Trial Exhibit M.

17. Trial Exhibit T.

18. Trial Exhibit G.

19. Trial Exhibit G.

20. Trial Exhibit G.

21. Trial Brief in Opposition to Debtor's Amended Motion for Damages and Attorney's Fees, filed by the EDD on January 28, 2008, 2:21–23. *See also*, Deposition of Morris Hampton of the EDD, admitted into evidence at trial by stipulation of the parties, at 26:17–27:25:

[Morris Hampton answering]
A. It was another request for reinstatement of the license.
[Attorney Cathleen Cooper Moran questioning]
Q. What did you do?

A. I believe I contacted your office and tried to ascertain some information on the nature of how the plan was going to be funded because there wasn't a plan at that time. And I didn't know what was different in what I was seeing than what had been present in the past.
Q. What relevance did you believe that had, that information you were seeking had to the decision to reinstate the license or not to reinstate the license?
A. To our knowledge, the debtor was in a situation where he was earning wages and could fund it other than with the Contractors License.
. . .
Q. My question is: What information did you think you needed to have in order to recommend reinstatement of the license?
A. Why did he need the license?
Q. You thought that was the central issue to whether the license ought to be reinstated or not?
A. Based on the fact that he was earning wages to fund a plan, yes.
Q. So was it your thought then that if he was earning wages he didn't need a license?
A. He was consistently earning wages at the same place.
Q. And therefore what?

received a copy of the Debtor's Chapter 13 plan from the Debtor's counsel, as requested.[22]

On November 1, 2004, the Debtor's attorney called to advise the CSLB that she would be filing a motion seeking an injunction and would fax those documents to the CSLB.[23] The CSLB received this fax and forwarded it to the EDD.[24] After this fax was sent to the EDD, the CSLB received an email from the EDD's representative authorizing the release of the license.[25] The CSLB released the Debtor's contractor's license that same day.[26]

On November 1, 2004, the Debtor commenced this Adversary Proceeding by filing the Complaint. On November 3, 2004, a hearing was held on the Debtor's motion for a temporary restraining order and preliminary injunction against the Defendants. Not aware that the Debtor's contractor's license had been reinstated just two days before, on November 1, 2004[27], the Court issued a Preliminary Injunction through December 9, 2004, requiring the immediate reinstatement of the Debtor's contractor's license. At the January 27, 2004 continued hearing of this matter, the Debtor's request for a preliminary injunction was denied as moot.

On December 16, 2004, the Debtor filed a motion for damages for violation of the automatic stay (the "Motion for Damages").

Roughly nine months after the filing of his Chapter 13 bankruptcy, on July 8, 2005, the Debtor formed a California corporation named European Floor Coverings, Inc.[28] About seven months later, on February 14, 2006, the Debtor filed an application with the CSLB for a corporate license under the name European Floor Coverings, Inc.[29] The Debtor testified at trial that this second application was not granted because his contractor's license was suspended.[30] However, evidence presented by the CSLB at trial shows this application was denied for other reasons, which would become very significant after the trial. In considering this application, the CSLB asked for additional information regarding the Debtor's criminal history. The Debtor failed to respond to this request for information and the "application went void for failure to comply."[31] Evidence presented at trial shows that the

A. What was different in needing the license that he hadn't had for almost a year and a half.

22. Deposition of Morris Hampton at 32:5–7.

23. Trial Transcript, Vol. II, 25:12–17; Trial Exhibit G.

24. Trial Transcript, Vol. II, at 27:1–3.

25. *Id.* at 27:5–8.

26. *Id.* at 27:12–13.

27. On November 1, 2004, the CSLB was instructed by the EDD that the suspension of the Debtor's license could be lifted. Trial Exhibit I. The CSLB lifted the license suspension on November 1, 2004. On November 2, 2004, the CSLB sent a letter to the Debtor indicating his license had been reinstated effective November 1, 2004. Trial Exhibit K.

Also on November 2, 2004, Staci Pugh of the CSLB called the Debtor's counsel to advise her of the reinstatement and left a message. Trial Transcript, Vol. II, 52:14–53:1.

28. Trial Exhibits D and S.

29. Trial Exhibit V.

30. Trial Transcript, Vol. I., 57:18–24.

31. Trial Transcript, Vol. II, 39:14–40:1. The Debtor testified at trial that the CSLB requested a copy of his "rap sheet" as part of his application for a corporate license. Trial Transcript, Vol. II, 99:3–4. The Debtor testified that this rap sheet was provided to the CSLB three times, but because it was not provided by the Debtor in the correct format and in a timely matter, the application was void and he would have to reapply. Trial Transcript, Vol. II., 95:23–96:1, 103:5–10.

Debtor was using the business name "European Floor Coverings" as early as October 2004.[32]

Trial on this matter was held on February 13 and 15, 2008. The CSLB has alleged that, in the course of the trial, it learned for the first time that the Debtor had lied on his original application for a contractor's license, as well as on his subsequent applications for corporate contractor's licenses.[33] Specifically, the Debtor failed to disclose several prior criminal convictions. Trial Transcript, Vol. II, p. 60:14–63:4. The CSLB insisted that the Debtor "had multiple convictions for serious crimes and acts for which CSLB will routinely not issue a license." [34]

On April 11, 2008, a hearing was held before the CSLB regarding the revocation of the Debtor's contractor's license.[35] On April 16, 2008, Administrative Law Judge Melissa G. Crowell issued a proposed decision to revoke the Debtor's contractor's license in light of his repeated failure to disclose his criminal record, as well as his entry into contracts for the installation of flooring while his license was suspended.[36] On May 1, 2008, the CSLB issued a decision adopting the proposed decision of Judge Crowell.[37] On June 2, 2008, the decision of the CSLB became final and the Debtor's contractor's license was again revoked, this time with a one year bar for reapplying for a reissuance or reinstatement.[38]

## II.

### ANALYSIS

■ In both his Complaint and his Motion for Damages, the Debtor has alleged that the Defendants willfully violated the automatic stay by failing to timely reinstate his contractor's license upon notice of his bankruptcy filing. The Debtor seeks

32. Trial Exhibit M and Trial Transcript, Vol. I., 57:7–13.

33. Defendant Contractors' State License Board Post–Trial Brief, filed June 25, 2008, at 2:2–5 states: "During cross-examination on a mundane matter, Plaintiff Bertuccio made an untruthful statement. When that statement was investigated further, it was discovered that Plaintiff Bertuccio had fraudulently obtained the contracting license on which he was attempting to sue CSLB."

*See also* Defendant Contractors State License Board and Registrar Stephen P. Sands Post Trial Brief ("CSLB's Post Trial Brief"), filed May 30, 2008, at 6:13–14. The CSLB has argued in its Post Trial Brief that the Debtor "has committed multiple acts of bankruptcy fraud against this Court from filing and pursuing this matter to knowing that he had essentially stolen the license at issue, to each of the documents he filed in relation to his claim." CSLB's Post Trial Brief at 12:3–5. The CSLB has also asked that the Debtor's attorney, Cathleen Moran, be sanctioned for "prosecuting an action on an illegal contract and participating in bankruptcy fraud." CSLB's Post Trial Brief at 17:11. CSLB also "preserves all of its rights to pursue state and federal criminal charges against Plaintiff that were discovered during this case even though not listed on Defendant's Answer." CSLB's Post Trial Brief at 13, n. 8.

34. CSLB's Post Trial Brief at 4:17–18. At trial, Staci Pugh testified that, in her 26½ years of experience working for the CSLB, she had never known the CSLB to issue a license to an applicant with Plaintiff's criminal history. Trial Transcript, Vol. II, 43:12–17. Ms. Pugh is currently a Programmer II with the CSLB. *Id.* at 9:16. Between 1995 and 2006, Ms. Pugh worked in the Judgment Unit of the CSLB, where she was responsible for first suspending the Debtor's license and then lifting that suspension at the direction of the EDD. *Id.* at 13:8–27:13.

35. EDD's Closing Post Trial Brief, filed May 30, 2008, Attachment 1.

36. *Id.*

37. Request for Judicial Notice Pursuant to 28 U.S.C. Section 201, filed by CSLB on 6/25/08, Exhibit B.

38. *Id.*

actual and exemplary damages against the Defendants pursuant to Bankruptcy Code § 362(h).[39] Section 362(h) creates a statutory remedy for individual debtors who are injured by a violation of the automatic stay. It provides:

> (h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h). A party seeking damages for violation of the automatic stay must prove by a preponderance of the evidence that (1) a bankruptcy petition was filed; (2) the debtor is an individual; (3) the creditor received notice of the petition; (4) the creditor's actions were in willful violation of the stay; and (5) the debtor suffered damages. *In re Henry*, 328 B.R. 664, 667 (Bankr.E.D.N.Y.2005) (citations omitted).

The parties agree as to the underlying facts in this case and, therefore, the first three elements of this cause of action are easily met. The Debtor filed a Chapter 13 petition on October 7, 2004. On October 8, 2004, the Debtor's counsel provided actual notice of the filing to the CSLB via facsimile and asked that the Debtor's license be reinstated.[40] On October 14, 2004, the CSLB relayed this information to the EDD. A subsequent request for reinstatement was made by the Debtor's counsel to the EDD and further exchanges occurred. The Debtor's license was not reinstated until November 1, 2004, when the EDD finally authorized the CSLB to do so. Therefore, a total of twenty-four days elapsed between the date upon which the CSLB was given actual notice and the reinstatement of the Debtor's license. The CSLB had notice of the Debtor's bankruptcy for six days before relaying that information to the EDD to request permission to reinstate the license. Then, an additional eighteen days elapsed between the time the EDD received notice and the reinstatement of the Debtor's license. It also appears from the evidence presented that the license was reinstated on November 1, 2004 in response to the Debtor's Complaint, which was faxed to the Defendants and filed that same day.[41]

The disagreements between the parties relate to the final two elements of this cause action—the Defendants' alleged willful violation of the stay and the alleged damages suffered by the Debtor. The

39. Bankruptcy Code § 362 was substantially amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA"). Upon the enactment of the BAPCPA, what had been 362(h) became 362(k)(1). In addition, the BAPCPA added 362(k)(2), which now limits recovery to the actual damages sustained if the violating entity's actions were in good faith. However, this Adversary Proceeding was filed prior to the enactment of the BAPCPA, therefore, as also noted at footnote 1, the code sections referenced herein shall refer to the Bankruptcy Code as it was in effect at the time of the filing of this Adversary Proceeding.

40. The official notice of the bankruptcy filing was not mailed by the Court until October 28, 2004. However, it is common for key creditors to receive actual notice of the filing prior to the issuance of the notice from the Court. "Such 'informal' notice … can constitute notice sufficient for a finding of willfulness." March, Ahart & Tchaikovksy, CAL. PRAC. GUIDE: BANKRUPTCY (The Rutter Group 2007) at ¶ 8:880, *citing In re Abrams*, 127 B.R. 239, 240–244 (9th Cir. BAP 1991)(creditor who repossessed debtor's vehicle postpetition, without knowledge of the bankruptcy filing, willfully violated stay by refusing to return vehicle after being notified of debtor's bankruptcy by fax from debtor's attorney); *In re Knaus*, 889 F.2d 773, 775 (8th Cir.1989)(creditor's failure to return property lawfully taken prepetition after bankruptcy notification and demand from debtor constituted willful violation of stay).

41. Deposition of Morris Hampton at 36:11–37:11.

Court must, therefore, decide two separate issues to resolve this matter. First, did the Defendants willfully violate the automatic stay by failing to reinstate promptly the Debtor's contractor's license postpetition? Second, if so, what are the Debtor's actual damages for such violation?

## A. *Willful Violation*

■ On the issue of whether a violation of the automatic stay is "willful," the Ninth Circuit Bankruptcy Appellate Panel has held:

> An award of actual damages under § 362(h) requires a showing by the debtor that she sustained an injury from a "willful" violation of the stay. A "willful violation" does not require specific intent to violate the automatic stay. A violation of the automatic stay is "willful" if 1) the creditor knew of the stay and 2) the creditor's actions, which violated the automatic stay, were intentional.

*In re Roman,* 283 B.R. 1, 7–8 (9th Cir. BAP 2002) (internal citations omitted). *Accord, In Re Pace,* 67 F.3d 187, 191 (9th Cir.1995); *In Re Bloom,* 875 F.2d 224, 227 (9th Cir.1989); *In re Abrams,* 127 B.R. 239, 243 (9th Cir. BAP 1991).

> Once a creditor knows that the automatic stay exists, the creditor bears the risk of all intentional acts that violate the automatic stay regardless of whether the creditor means to violate the automatic stay.

*In re Campion,* 294 B.R. 313, 318 (9th Cir. BAP 2003).

The parties agree that the prepetition suspension of the Debtor's contractor's license was not a violation of any stay. There is also no dispute that, after being notified of the Debtor's bankruptcy filing, the CSLB and the EDD failed to reinstate the license for twenty-four days. The issue is whether the delay in the reinstatement of the license constitutes a willful violation of the automatic stay.

The applicable provision of Bankruptcy Code § 362(a)(1) provides as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C § 362(a)(1).

The Debtor notes that 362(a)(1) specifically prohibits the continuation of an administrative proceeding pending against the Debtor that was commenced prepetition. The Debtor contends that the suspension of his contractor's license constitutes such an administrative proceeding. In response to the Debtor's arguments that the Defendants willfully violated the automatic stay, the Defendants raise several defenses. First, the Defendants argue that no violation occurred since they took no affirmative act after the commencement of the Debtor's bankruptcy case to collect the debt owed by the Debtor to the EDD. Second, the Defendants argue that their actions related to the reinstatement of the Debtor's contractor's license are protected under the "police powers" exception of § 362(b)(4). Third, the EDD argues that the stay was not violated because, under California State law, the Debtor was not entitled to reinstatement of his license until he satisfied his tax

obligations. Fourth, the CSLB argues that it was acting pursuant to state statute and at the direction of the EDD. Finally, related to the Defendants' arguments regarding their statutory authority under California State law, the Defendants argue that it was within their discretion to determine whether a debtor "needs" his contractor's license reinstated to effectuate the debtor's bankruptcy plan. If the Defendants decided that the Debtor did not "need" his contractor's license to fund his bankruptcy case, then, at least in Defendants' view, they were not required to reinstate the license and their refusal to reinstate the license would not constitute a violation of the automatic stay. The Court will address each of the defenses raised separately.

### 1. *Affirmative Act to Collect Debt*

The EDD argues that its initial decision not to allow the reinstatement of the license was not the functional equivalent of an affirmative act to collect a prepetition claim, which would constitute a stay violation. The Defendants note that the suspension of the Debtor's license occurred several months prepetition. Even though the basis of this suspension was the Debtor's non-payment of a debt owed to the EDD, the Defendants argue that their initial refusal to reinstate the Debtor's license upon his bankruptcy filing was not an affirmative act to collect the prepetition debt. Rather, the Defendants argue they were simply reviewing the Debtor's case to determine if the suspension of his license should be removed.

The Debtor counters that the Defendants had an affirmative duty to lift the suspension of the license upon receiving notice of the Debtor's bankruptcy filing. *Eskanos & Adler, P.C. v. Leetien,* 309 F.3d 1210, 1215 (9th Cir.2002). An unjustifiable delay in correcting the creditor's behavior in violation of the automatic stay may warrant the award of sanctions against the

creditor. *Leetien,* 309 F.3d at 1215. The Debtor alleges that the Defendants violated their affirmative duty by failing to reinstate the Debtor's license for twenty-four days after receiving notice of the bankruptcy filing and the Debtor's request for reinstatement.

An affirmative duty to undo actions taken before the imposition of the automatic stay has been recognized by many cases, albeit in slightly different factual contexts than the case at hand. *See In re Del Mission, Ltd. (EDD v. Taxel),* 98 F.3d 1147 (9th Cir.1996)(State's continued retention of taxes violated the automatic stay), *In re Roberts (FTB v. Roberts),* 175 B.R. 339, 343 (9th Cir. BAP 1994)("[A] garnishing creditor has an affirmative duty to stop garnishment proceedings when notified of the automatic stay."), *In re Abrams,* 127 B.R. 239 (9th Cir. BAP 1991) (creditor that repossessed a car postpetition without notice of the bankruptcy violated the stay by refusing to turn the car over when notified of the bankruptcy filing). *See also In re Henry,* 328 B.R. 664 (Bankr.E.D.N.Y.2005)(law firm violated the stay when the firm failed to release a lien placed prepetition on the debtor's bank account), *In re Jessamey,* 330 B.R. 80 (Bankr.D.Mass.2005)(judgment on the pleadings denied since City could violate the automatic stay by failing to release a hold on the debtor's car registration which had been lawfully blocked prepetition for the debtor's failure to pay a tax).

The exact question at issue in this case—which is not specifically addressed by any of the cases noted above—is whether the State of California has an affirmative duty to reinstate a contractor's license (which was suspended solely for failure to pay a tax) upon the contractor's bankruptcy filing. Cases have· found that a State agency cannot condition the reinstatement of a license postpetition upon the payment

in full of back taxes.[42] However, the parties have not cited, and the Court has not found, a case directly addressing the issue of whether the State has an affirmative duty to reinstate a contractor's license under these circumstances.

■ While not directly on point, *Grimes v. Hoschler,* 12 Cal.3d 305, 525 P.2d 65, 115 Cal.Rptr. 625 (Cal.1974) does provide some insight. In *Grimes,* the California Supreme Court held that a earlier version of Cal. Bus. & Prof.Code § 7113.5—which allowed the suspension of a contractor's license if the contractor's "debts incurred as a contractor were discharged for less than their full amount in a bankruptcy proceeding" and further forbade "the reissuance of a revoked license until the amounts of the discharged debts are paid in full"—was invalid under the supremacy clause of the United States Constitution in that it conflicted with the provisions of the Bankruptcy Act. Just as the *Grimes* court held that the discharge of debts in a bankruptcy proceeding cannot be a basis for refusing to reinstate a contractor's license, by logical extension, the Defendants cannot simply refuse to reinstate the Debtor's license upon his bankruptcy filing. The sole basis for the initial suspension of the Debtor's license was his non-payment of a debt owed to the EDD. The practical effect of the Defendants non-action is the same as if they were refusing to reinstate the license solely because of the potential discharge of the debt to the EDD in the Debtor's bankruptcy. In this regard, the facts presented are analogous to those in the *Del Mission, Roberts, Abrams, Henry* and *Jessamey* cases noted above, in which an affirmative duty to undo prepetition actions was found. For these reasons, under the circumstances presented, the Court finds that the Defendants did have an affirmative duty to reinstate the Debt-

or's contractor's license upon notice of his bankruptcy filing.

However, the Court's finding of an affirmative duty by the Defendants to reinstate the Debtor's license does not end the inquiry as to whether the Defendants willfully violated the automatic stay. The other defenses raised by the Defendants must first be analyzed.

### 2. Police Powers under § 362(b)(4)

■ The next defense raised by the Defendants is the State's exercise of its "police powers." The "police powers" exception to the automatic stay is recognized in Bankruptcy Code § 362(b)(4) which provides:

The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

. . .

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

11 U.S.C. § 362(b)(4). By its own language, the "police and regulatory powers" exception of 362(b)(4) does not include ac-

---

**42.** *See* discussion at page 619–20 and note 48   *supra.*

tions by the governmental unit to enforce a money judgment. "This exception is intended to allow governmental units to sue a debtor 'to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law....'" *In re Dunbar*, 235 B.R. 465, 471 (9th Cir. BAP 1999), *aff'd*, 245 F.3d 1058 (9th Cir.2001), *quoting*, House and Senate Reports (Reform Act of 1978) (H.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978)). The police power exception must be narrowly construed and is only meant to apply to actions that further public health and safety. *In re PMI–DVW Real Estate Holdings, LLP*, 240 B.R. 24, 31 (Bankr.D.Ariz. 1999).

The application of the police powers exception is not automatic. *Dunbar*, 235 B.R. at 471. Two tests have developed to determine whether a state agency's administrative action falls with the police powers exception—the "pecuniary purpose" test and the "public policy" test. The Ninth Circuit Bankruptcy Appellate Panel has described these two tests as follows:

> Under the "pecuniary purpose" test, the court must determine whether the government action relates "primarily to the protection of the government's pecuniary interest in the debtors' property or to matters of public safety and welfare." *In re Universal Life Church. Inc.*, 128 F.3d 1294, 1297 (9th Cir.1997), *cert. denied*, 524 U.S. 952, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998) (*citing N.L.R.B. v. Continental Hagen Corp.*, 932 F.2d 828, 833 (9th Cir.1991)). "Indeed, most government actions which fall under [§ 362(b)(4)] have some pecuniary component, particularly those associated with fraud detection. This does not abrogate their police power function. Only

if the action is pursued 'solely to advance a pecuniary interest of the governmental unit' will the automatic stay bar it." *Universal Life Church*, 128 F.3d at 1299 (9th Cir.1997) (*quoting Thomassen*, 15 B.R. at 909).

> The "public policy" test distinguishes between those proceedings that effectuate public policy and those that adjudicate private rights. *Universal Life*, 128 F.3d at 1297; *In re Charter First Mortg., Inc.*, 42 B.R. 380, 383 (Bankr.D.Or.1984). Under the latter test, the court considers whether the administrative agency is exercising legislative, executive, or judicial functions. *In re Poule*, 91 B.R. 83, 86 (9th Cir. BAP 1988). "Where the agency's action affects only the parties immediately involved in the proceedings, it is exercising a judicial function and the debtor is entitled to the same protection from the automatic stay as if the proceeding were being conducted in a judicial form." *Id.*

*Dunbar*, 235 B.R. at 471.

The Debtor argues that the suspension of his contractor's license was triggered solely by his failure to pay prepetition employment taxes, and that the license would have been reinstated as soon as the Debtor paid those taxes. That being the case, per the Debtor, there is no issue of public health or safety furthered by the suspension. The Debtor argues that the collection of the taxes owed to the EDD is not an exercise of the State of California's police power and, thus, is subject to the automatic stay.

The Defendants insist that the CSLB is a government agency charged with the authority to qualify, license and discipline contractors in the State of California.[43] After an individual is licensed with the State, that individual is required to comply

---

43. Cal. Bus. & Prof.Code §§ 7065 and 7090.

with the laws of the State or risk discipline against his license. These disciplinary actions may include suspension, probation or outright revocation of the license. The Defendants argue that the suspension of the Debtor's license was not solely to advance the pecuniary interest of the EDD. Rather, per the Defendants, the CSLB suspended the license under Cal. Bus. & Prof.Code § 7145.5 as a means of regulating the business activities of contractors under the CSLB's licensure.

The Defendants note that, under the "pecuniary interest" test, only actions that are *solely* to advance a pecuniary interest of the governmental unit are outside the police powers exception to the automatic stay. *Universal Life Church,* 128 F.3d at 1298–99. The statute under which the Debtor's license was suspended does not provide for the actual collection of taxes, it simply allows the suspension of license of contractors who fail to comply with California State law. Cal. Bus. & Prof.Code § 7145.5(a)(1) specifically provides as follows:

> The registrar may refuse to issue, reinstate, reactivate, or renew a license or may suspend a license for the failure of a licensee to resolve all outstanding final liabilities, which include taxes, additions to tax, penalties, interest, and any fees that may be assessed by the board, the Department of Industrial Relations, the Employment Development Department, or the Franchise Tax Board.
>
> (1) Until the debts covered by this section are satisfied, the qualifying person and any other personnel of record named on a license that has been suspended under this section shall be prohibited from serving in any capacity that

is subject to licensure under this chapter, but shall be permitted to act in the capacity of a nonsupervising bona fide employee.

Since the statute does not call for the actual collection of the delinquent taxes—but rather disciplinary actions against the contractor—the Defendants argue that the "pecuniary interest" test is satisfied.

■ This argument by the Defendants may seem to have merit at first glance, but it simply does not hold up upon closer examination. The pecuniary purpose test distinguishes "between governmental actions which are aimed at obtaining a pecuniary advantage for the unit in question or its citizens, and those actions which represent a direct application of the unit's police or regulatory powers." *In re Thomassen,* 15, B.R. 907, 909 (9th Cir. BAP 1981). In the Debtor's case, the continued suspension of his contractor's license was unquestionably for the purpose of "obtaining a pecuniary advantage." There can be no doubt that if the Debtor had paid the taxes owing to the EDD, his license would have been reinstated promptly by the CSLB.[44] As soon as the EDD authorized the CSLB to remove the suspension, the CSLB did so immediately without further inquiry. Further, the Notice of Suspension mailed by the CSLB to the Debtor on August 26, 2003 unequivocally states: "This suspension *will be* lifted when you submit proof from the EMPLOYMENT DEVELOPMENT DEPARTMENT that the liability has been satisfied." Trial Exhibit F (emphasis added). Thus, the Debtor needed to do nothing more than pay the debt owing to the EDD. The EDD readily admits that one of its purposes in requiring

---

**44.** Not until this matter went to trial did the CSLB become aware of other "bad acts" by the Debtor, for which the CSLB ultimately sought and obtained revocation of the Debtor's contractor's license. At the time that the alleged violation of the automatic stay occurred, the sole basis upon which the suspension of the Debtor's license was being maintained was the tax debt owed to the EDD.

review of the Debtor's plan before it would allow the suspension to be released was so that the EDD could ensure its claims would be paid under the plan.[45] There was no issue of public safety or welfare behind the continued suspension of the Debtor's license.[46] It was simply a matter of owing back taxes. It is clear, therefore, that the continued suspension of the Debtor's license was done solely to advance the pecuniary interests of the EDD. For that reason, the Defendants actions fail the "pecuniary interest" test for the police powers exception.

The EDD also argues that the Defendants should prevail under the "public policy test" for determining whether the police powers exception applies. *In re Herr*, 28 B.R. 465, 468 (Bankr.D.Me.1983). This approach distinguishes between proceedings that effectuate a public policy and those that adjudicate private rights. The EDD says that neither it nor the CSLB was attempting to adjudicate private rights in this case, therefore, this test is satisfied.

While it may be true that the Defendants were not pursuing private rights such as restitution for victims of violations of California State laws, that does not necessarily mean that the Defendants' actions meet the "public policy" test. The Ninth Circuit Bankruptcy Appellate Panel has provided some additional guidance with the respect to the "public policy" test:

> [W]here a state agency is attempting to punish a debtor for fraudulent conduct by assessing civil penalties, or where it is attempting to prevent future occurrences of fraud through injunctive relief,

the action comes within the scope of section 362(b)(4).

*Poule*, 91 B.R. at 87. The purpose of the State of California's Contractor's Licensing Law is "to guard the public against the consequences of incompetent workmanship, imposition, and deception." *Poule*, 91 B.R. at 87, *citing Asdourian v. Araj*, 38 Cal.3d 276, 282, 211 Cal.Rptr. 703, 696 P.2d 95 (1985). Its purpose is not to ensure the payment of taxes owing to the EDD, which is how it was used against the Debtor in this case. In this case, there was no such incompetent, fraudulent or deceptive conduct underlying the suspension of the Debtor's license or the EDD's refusal to authorize the release of this suspension. Therefore, the actions of the Defendants also fail the "public policy" test for the police powers exception.

### 3. Debtor's Entitlement to Reinstatement Under State Statute

The next argument raised by the Defendants, which is somewhat related to their "no affirmative act" defense, is that they were not required, under California State law, to reinstate the Debtor's license. In support of this argument, the EDD cites two Bankruptcy Court decisions, one from the Eastern District of California and one from the Eastern District of Arkansas—*In re Feature Homes, Inc.*, 116 B.R. 731 (Bankr.E.D.Cal.1990) and *In re Kimsey*, 263 B.R. 244 (Bankr.E.D.Ark.2001). Both of these cases are easily distinguishable from the facts at hand and provide little support for the Defendants' argument.

---

**45.** *See* Trial Brief in Opposition to Debtor's Amended Motion for Damages and Attorney's Fees, filed by the EDD on January 28, 2008, at 2:23–26. *See also* Deposition of Morris Hampton at 31:11–21, 33:2–18

**46.** *Compare In re Poule*, 91 B.R. 83 (9th Cir. BAP 1988) ("It is undisputed that the debtor ... had committed serious violations of the

Contractor's State License Law and ample grounds existed for revoking his license." The CSLB found that the debtor had abandoned a project without just excuse and had taken payment for materials not used on the project, compelling the customer to secure the services of other contractors to complete the job.) No such malfeasance on the part of the Debtor is alleged here.

The EDD cites *Feature Homes* for the proposition that a State's refusal to reinstate the debtor's corporate status, which had been suspended for failure to pay franchise taxes, did not constitute a violation of the stay. While this may have been the result in *Feature Homes,* this particular proposition was, at best, *dicta* in a footnote of that decision. Every subsequent case that has discussed *Feature Homes* has cited it for the proposition that a corporation, whose powers are suspended, may nonetheless file bankruptcy to wind up its affairs.[47]

In *Feature Homes,* a corporate debtor entered into a stock sale agreement prepetition in which the debtor agreed to sell 100% of its interest in a non-debtor company (the "Stock Sale Agreement"). Roughly one month after the Stock Sale Agreement was entered into, but before it was finalized, the debtor's corporate status was suspended for failure to pay taxes and/or file tax returns. Three days later, the debtor filed its voluntary Chapter 11 petition. The Bankruptcy Court approved the debtor's assumption of the Stock Sale Agreement. The debtor then moved to compel the State to issue a certificate of revival of the debtor's corporate status. The Bankruptcy Court denied the debtor's motion on the basis that "the issuance of a certificate of revivor is completely unrelated and irrelevant to successful closing of the Stock Sale Agreement." *Id.* at 733.

*Feature Homes* is not controlling on this Court and is factually distinguishable on many levels. The debtor in *Feature Homes* had already agreed to the sale of its principal asset, before its bankruptcy filing. It was obvious, therefore, that the debtor would not continue its business operations, and, therefore, did not, in the Court's determination, need its corporate

status revived. Further, the debtor in *Feature Homes* was a corporation, not an individual. Finally, *Feature Homes* did not arise in the context of an action for damages under § 362(h); instead *Feature Homes* found that the debtor's motion to compel reinstatement of the debtor's corporate status under §§ 362(h) and 525(a) was unnecessary and premature at that point in the case. The Stock Sale Agreement did not require the debtor's corporate status to be current in *Feature Homes,* and the Bankruptcy Court could and did approve the sale regardless of the debtor's corporate status. While the *Feature Homes* court decided not to grant the "extraordinary relief requested at this time", it left open the possibility that the court might compel such a revivor in the future "in the event that [the debtor] chooses to reactivate its contracting business." *Id.* at 733.

Those are far from the facts presented in our current case. Unlike the corporate debtor in *Feature Homes,* the Debtor specifically advised the Defendants of his desire to reinstate his contractor's license so that he could continue his business operations postpetition. The Debtor here was certainly not selling his assets and terminating his business operations, but rather was seeking to reinstate his license and to increase those business operations as part of his reorganization. For these reasons, the *dicta* in *Feature Homes* is not applicable here.

The other case cited by the EDD is *In re Kimsey,* 263 B.R. 244 (Bankr. E.D.Ark.2001). The EDD cites *Kimsey* for the proposition that a City's refusal to reinstate a Chapter 13 debtor's driver's license, which had been suspended prepetition as a result of the debtor's

---

**47.** *In re Realty Trust Corp.,* 1994 WL 202439 (9th Cir.1994); *In re Sacramento Mini Storage,* 1997 WL 206077 (9th Cir.1997); *In re*

*Kingsley,* 2000 WL 33679445 (Bankr.D.N.H. 2000).

traffic violations as well as for the failure to pay resultant fines, did not violate the automatic stay. In *Kimsey,* the debtor filed an adversary complaint to compel the reinstatement of his driver's license. The debtor's confirmed plan provided for the payment of all traffic fines, but the City of North Little Rock did not reinstate the debtor's license. The debtor argued that the City was in violation of § 362.(a)(6) because the City refused to reinstate his driver's license. The *Kimsey* court rejected this argument and found:

> The evidence before the Court is that, prior to the filing of the chapter 13 case, the debtor's license was validly suspended for his failure to comply with the laws of the State of Arkansas and there is no requirement in the Bankruptcy Code, including section 362, that a governmental unit reinstate the privilege to operate a motor vehicle simply because the individual later files a bankruptcy case. Thus, the City is not in violation of the automatic stay for refusing to lift the suspension of this driving privileges.

*Id.* at 246.

While this language from *Kimsey* appears to present a more compelling analogy for the Defendants, *Kimsey* too is not truly applicable to the facts at hand because the payment of the fines owed by the debtor in *Kimsey* would *not* have resulted in the reinstatement of the debtor's license. As Judge Montali noted in the recent case of *In re Thomas,* 2007 WL 1079980 at *3 (Bankr.N.D.Cal.2007), in *Kimsey:*

> [T]he debtor pleaded guilty to "driving without a driver's license, unsafe driving, failing to have proof of liability in-

surance (and, in a subsequent year, failing to have liability insurance), leaving the scene of an accident, driving on a suspended license, and failing to yield the right of way." *Id.* at 246. The debtor in *Kimsey* alleged that the refusal to reinstate his license was for financial reasons, but the court found "no evidence" that the government "has in fact taken any action to collect the debt." *Id.* Instead it found that "the City is not refusing to reinstate the debtor's license because of his bankruptcy filing, but, rather, seeks to enforce the traffic [safety] laws which permit termination of the driving privilege based upon violations of the law." *Id.* at 247.

Beyond owing fines to the City, the suspension of the debtor's license in *Kimsey* was because of the debtor's serious traffic and safety violations and, therefore, was an issue of public safety and punishment. Kimsey could not avoid the punishment of having his license suspended simply by paying the fines or by filing bankruptcy.

■ Those are not the facts surrounding the suspension of the Debtor's contractor's license. While Cal. Bus. & Prof.Code § 7145.5(a)(1) allows for the punishment of a contractor for the failure to pay all outstanding debts to the State of California, it also contemplates that this punishment only lasts "until the debts covered by this section are satisfied." Several courts have found that a requirement of payment in full of all back taxes as a condition to reinstatement of a license by a state agency is violative of 11 U.S.C. § 362.[48] The EDD's refusal to grant the CSLB's request to allow reinstatement of the license

---

**48.** *Taxel v. California Employment Dev. Dep't (In re Del Mission Ltd.),* 116 B.R. 734 (Bankr. S.D.Cal.1990), *aff'd,* 130 B.R. 362 (9th Cir. BAP 1991), *aff'd,* 998 F.2d 756 (9th Cir.1993); *In re Nu–Process Brake Engineers, Inc.,* 119 B.R. 700, 702–03 (Bankr.E.D.Mo.1990), *citing In re William Tell II, Inc.,* 38 B.R. 327 (N.D.Ill.1983) and *In re Nashville White Trucks, Inc.,* 22 B.R. 578 (Bankr.M.D.Tenn. 1982).

was an "affirmative act to collect a prepetition claim." There was no overriding issue of public safety relating to the suspension of the Debtor's contractor's license, as there was in the suspension of the debtor's driver's license in *Kimsey*. Therefore, the EDD's reliance on *Kimsey* is also misplaced.

### 4. CSLB Acting Under Direction of the EDD

The CSLB argues that it did not violate the automatic stay since it was simply complying with Cal. Bus. & Prof.Code § 7145.5. The CSLB insists that it could not legally remove the prepetition revocation of the Debtor's license until it was authorized by the EDD to do so. While this may be true, it does not address the fact that the CSLB delayed six days after receiving actual notice of the Debtor's bankruptcy filing before it even contacted the EDD seeking permission to reinstate the Debtor's license per his request.

### 5. Discretion to Determine Whether the Debtor "Needs" his Contractor's License

■ Finally, as made clear at trial, the Defendants raise one final defense on the issue of whether they violated the automatic stay in refusing to reinstate the Debtor's license for twenty-four days. The Defendants argue that since the Debtor had continued to operate his business without his contractor's license for more than a year prior to filing, the Debtor did not "need" his license to effectuate his bankruptcy. The Court rejects the general proposition asserted by the Defendants that they may simply refuse to act as long as they determine, in their sole discretion, that the reinstatement of the Debtor's license is not necessary for his bankruptcy case. This is not their decision to make and not even a proper inquiry on their part. Further, it is preposterous for the Defendants—particularly as agents of the

State of California—to argue in one breath that the Debtor violated California State licensing law by continuing to operate without a license for over a year, and then suggest that they did not have to reinstate the Debtor's license because he could simply continue to operate illegally without one.

The Defendants cite no authority in support of their argument that the Defendants could delay reinstating a debtor's license while they consider whether that debtor "needs" his license reinstated upon his bankruptcy filing. The only case that this Court has found which even remotely raises the issue of a debtor's "need" for authorization by a State agency is *Feature Homes*. In *Feature Homes*, the Bankruptcy Court found that the debtor had already sold all of its assets and the State's refusal to revive the debtor's corporate status had "little or no tangible impact upon this particular" debtor since the debtor had "apparently not engaged in any contracting work for over three years, and [had] made no offer of proof that it in fact intends to pursue this occupation through a subsequent plan of reorganization." *Id.* at 733. The *Feature Homes* decision then goes on to note:

> Of course, it may be that the Debtor will require a certificate of revivor in the event that it chooses to reactivate its contracting business under a confirmed plan of reorganization. In the event the State refuses to voluntarily issue such a certificate following confirmation of the plan by this court, the issue will no doubt be ripe for reconsideration.

*Id.* at 733, n. 5.

The EDD does not contend that it relied on this language from *Feature Homes* in thinking it had the right to review the Debtor's Chapter 13 plan before deciding whether or not to allow the CSLB to reinstate the Debtor's license. However, even

if that contention had been made, any such reliance would have been misplaced. This language from *Feature Homes* was buried in a footnote and is clearly *dicta*. Further, even in this language from *Feature Homes*, it is the Court—not the State agency—deciding whether the debtor's corporate status was necessary for its bankruptcy case.

If the Defendants had any serious doubt about this issue, the Defendants could have easily sought expeditious guidance from the Court on the issue of the Debtor's "need" for his contractor's license, before reinstating the Debtor's license.[49] Instead, the EDD asked for a copy of the Debtor's Chapter 13 plan.[50] When the EDD received the plan, the EDD still refused to release the suspension of the Debtor's license because it was concerned how the EDD's claim would be treated under the plan.[51] Although the Defendants now say their concern was that the Debtor did not "need" his contractor's license for his bankruptcy case, the actions of the EDD clearly show its true motivation was the collection of the debt owed by the Debtor to the EDD. Only upon receiving a copy of the Debtor's motion for a temporary restraining order did the EDD then decide to release the hold on the Debtor's license.[52] The EDD still insists that it was not required to do so, but that it simply chose to do so.

The Court finds that it would frustrate the very purposes of a bankruptcy filing if State agencies were given the time and discretion to determine, at their leisure, whether a bankruptcy debtor "needs" a license reinstated to effectuate his or her bankruptcy case.

### B. *Damages*

Upon a finding of willful violation of the automatic stay, an award of actual damages, including costs and attorneys' fees, must follow and is mandatory. *In re Taylor*, 884 F.2d 478, 483 (9th Cir.1989); *In re Ramirez*, 183 B.R. 583, 589 (9th Cir. BAP 1995); *In re Stainton*, 139 B.R. 232, 235 (9th Cir. BAP 1992). In appropriate circumstances, § 362(h) also allows the recovery of punitive damages. In this case, the Debtor seeks both actual and punitive damages.

#### 1. Actual Damages

"An award of actual damages under § 362(h) is intended to compensate a debtor for damages sustained as a result of a willful violation of the automatic stay." *Henry*, 328 B.R. at 668. *Accord Roman*, 283 B.R. at 9. The Ninth Circuit Bankruptcy Appellate Panel stated in *Roman:*

> Section 362(h) provides little guidance regarding the applicable standards for awarding actual damages. Nonetheless, most courts apply a reasonableness analysis. Section 362(h) "requires that the injured party be awarded the entire amount of actual damages *reasonably incurred* as a result of a violation of the automatic stay." *[In re] Stainton*, 139 B.R. [232,] 235 [9th Cir. BAP 1992] (emphasis added).

*Roman*, 283 B.R. at 11.

The Debtor has claimed that he lost certain profits as a result of the delay by the Defendants in reinstating his contractor's license. The Ninth Circuit has recognized that lost profits are " 'necessarily an estimate' ... and that their 'amount cannot be shown with mathematical preci-

---

49. The Court has serious doubts that this lack of "need"—even if proven—would constitute an exception to Bankruptcy Code § 362(h). However, the Defendants could have made those arguments to the Court prior to reinstating the license.

50. Deposition of Morris Hampton at 32:5–7.

51. *Id.* at 30:12–33:13.

52. *Id.* at 33:16–36:22

sion.' " [53] In support of his alleged lost profits, the Debtor initially relied upon two contracts he had entered into shortly before filing (the "Leal and Tovar Contracts").[54] Had his license been timely restored, the Debtor alleged he would have realized a profit of $14,238 from those two contracts.[55] However, evidence presented a trial shows that these contracts were cancelled and the deposits refunded prior to the filing of the Debtor's bankruptcy petition.[56] Therefore, the loss of the Leal and Tovar Contracts cannot constitute actual damages sustained by the Debtor. At best, as argued by counsel for the Debtor at trial, the Leal and Tovar Contracts may be some evidence of the Debtor's ability to obtain installation jobs at about the time of his bankruptcy filing.

At trial, the Debtor testified that prior to the suspension of his license, in the Summer of 2003, he realized about $40,000 per month in net profit from the installation portion of his business. The Debtor provided absolutely no documentary evidence or business records (*e.g.*, books and records showing sales, profits, etc.) in support of his testimony. While this testimony may be some evidence of a potential lost profit by the Debtor, it also fails to account for the fact that the Debtor alleges he had not installed flooring for over a year prior to his bankruptcy filing. Clearly a business that had not operated—or at least should not have been operating—for over a year will require some start-up time before it will again realize the same profits as it did at the height of its prior operations. At trial, the Debtor also submitted phone logs from potential customers between October 8, 2004 and October 30, 2004. While this provides some evidence of potential business, it is speculative at best.

Finally, in his Post Trial Brief, the Debtor suggests that the Court discharge the $12,385 claim of the EDD to "compensate the debtor in part for the injury caused by the state's violation of the automatic stay." [57] This is not a measure of compensatory damages and will not be awarded by the Court.

The Defendants raise several arguments against the alleged damages sustained by the Debtor.

First, the Defendants submit that the Debtor has not produced any evidence of actual damages for which he may recover. While the Court agrees that the Debtor cannot rely upon the specific values of the Leal and Tovar Contracts as evidence of actual damages sustained by the Debtor, those contacts do provide some limited evidence of the Debtor's ability to obtain installation jobs near the time of his bankruptcy filing. In addition, the Debtor—through the course of the trial—has submitted other evidence, albeit weak, in support of his damage claim.

Second, the Defendants argue that "the debtor's damages would appear to be minimal since he admits that he continued to operate his business illegally as a suspended corporation, and without a contractor's license for the 13½ months prior to filing the bankruptcy petition." [58] This is really

**53.** *Humetrix v. Gemplus,* 268 F.3d 910, 919 (9th Cir.2001) (internal citations omitted).

**54.** Trial Exhibits P, Q and R.

**55.** Trial Exhibit R at ¶ 9.

**56.** Trial Exhibit P shows that the deposit from Christopher Leal was returned on October 4, 2004. Trial Exhibit Q shows the deposit from Oscar Tovar was refunded at 1:50 P.M. on October 7, 2004. The Debtor's Chapter 13 petition was filed shortly after 3:00 P.M. that same day.

**57.** Plaintiff's Post Trial Brief at 6:1–3.

**58.** Trial Brief In Opposition to Debtor's Amended Motion for Damages and Attorney's Fees, filed by the EDD on January 28, 2008, at 8:9–12.

a multi-faceted argument by the Defendants. First, the argument is that if the Debtor actually continued his installation business notwithstanding the suspension of his license, then his business was not hurt by the fact he did not have a valid contractor's license. Second, if he was entering into installation contracts, they were illegal contracts pursuant to California state law—since he did not have a valid contractor's license at the time—and he cannot recover damages resulting from those contracts. Finally, since the Debtor was operating his business under the Statewide corporate name between 2001 and 2005, and the corporate status of Statewide was suspended on July 21, 2004, the Debtor was prohibited from legally operating his business as a corporation, even with his contractor's license reinstated.

Each part of this second defense fails. First, it is disingenuous of the Defendants to suggest that the Debtor's business operations were not hurt by the continued suspension of his license. Even assuming *arguendo* that the Debtor did operate the installation portion of his business without a valid contractor's license, he likely may not have gone full force with his advertising and other means of normal business development. Second, even if the Debtor is precluded by California state law from recovering from customers under contracts entered into without a valid contractor's license, the Debtor is not precluded, by this State law provision, from recovering damages against the CSLB and/or the EDD for violating the automatic stay. Fi-

nally, while Statewide's corporate status may have been suspended prior to the Debtor's bankruptcy filing—thereby, preventing Statewide from lawfully conducting business—the Debtor was operating, per the records of the CSLB, as a sole proprietor, not a corporation, under the business name "European Hardwood Floors Design & Interiors" from April 23, 2003.[59] The Leal and Tovar Contracts also specify the business name of European Hardwood Floor Design & Interiors.[60] Therefore, at least per the records of the CSLB, the Debtor could have legally operated as a contractor if the CSLB had removed the suspension placed on his license.

Finally, the Defendants argue that, as a court of equity, this Court should not allow the Debtor to recover damages when he has acted with "unclean hands."[61] The CSLB notes that the party seeking to recover damages from a court of equity must have "acted fairly and without fraud or deceit as to the controversy in issue."[62] The Defendants argue that the Debtor lied on his initial contractor's application and subsequent filings with the CSLB, and would not have been issued a license and/or would have had his license revoked earlier if he had not made such material misrepresentations. The Debtor, in turn, argues that the Court has "no need or jurisdiction to consider whether debtor should have been licensed."[63] The Court agrees that the Debtor's past "bad acts" do not negate the fact that the Defendants willfully violated the automatic stay. On

---

59. Trial Exhibits A, E, F, I, K

60. Trial Exhibits P and Q. However, "Statewide Professional Services"—without any "Inc." or other indication of possible corporate status—is noted at the very bottom of the Tovar Contract in very small type. Trial Exhibit Q.

61. *Kendall–Jackson Winery v. Superior Court,* 76 Cal.App.4th 970, 979, 90 Cal.Rptr.2d 743

(Cal.App. 5 Dist.1999), *ESP Fidelity Corp. v. Department of Housing and Urban Development,* 512 F.2d 887 (9th Cir.1975).

62. *Adler v. Fed. Republic of Nigeria,* 219 F.3d 869, 877 (9th Cir.2000).

63. Plaintiff's Post Trial Brief, filed on May 30, 2008, at 3:13.

the other hand, the Court cannot be blind to the fact that the Debtor may very well not have been entitled to the license upon which he now sues. Under the evidence presented, however, the Court need not and does not reach this problematic issue of the equities presented by this case—at least not at this point.

■■■ The Court need not decide this final defense raised by the Defendants because, after weighing all the evidence and arguments presented, the Court finds that the Debtor has failed to sufficiently establish any damages arising from the operation of his installation business. The Debtor has submitted three forms of evidence is support of his damages claim: (1) the Leal and Tovar Contracts, (2) his own testimony asserting he had averaged a net profit of roughly $40,000 per month for the installation component of his business before his license was suspended over a year prior to his filing, and (3) phone logs of potential customer calls from October 8, 2004 through October 30, 2004. The Court finds each of these items of evidence unpersuasive.

The Leal and Tovar Contracts are, at best, examples of the type of contract the Debtor may have been able to obtain had his license been reinstated. However, the Leal and Tovar Contracts were both entered into and cancelled just prior to the Debtor's bankruptcy.[64] Customers solicited by the Debtor postpetition, may very well have been much less receptive to a contractor operating while in bankruptcy—even with a reinstated contractor's license. Just as the Leal and Tovar customers may have searched the public records and determined that the Debtor was not a licensed contractor, customers can also search this Court's records to

determine if a contractor is a bankruptcy debtor. In any event, the Court finds that the Leal and Tovar Contracts are not persuasive evidence of any actual damages that the Debtor sustained from the Defendants' violation of the automatic stay for the twenty-four days involved here.

The Debtor's testimony about his past profits is also of little help. At trial, the Defendants submitted substantial evidence impeaching the Debtor's credibility. The Debtor could have submitted accounting records to support his testimony, but chose not do so. No documentary evidence, of any kind, was provided by the Debtor on the issue of his past income and expenses. The Court has no way of knowing what the Debtor's actual revenues were, either at the peak of his business or in the months immediately preceding his bankruptcy filing, when his license was suspended. Even if the $40,000 per month net profit testified by the Debtor is accurate, it is of limited relevance since it apparently represents the Debtor's revenues at the peak of his operations. At the time of his bankruptcy filing, the Debtor alleges he had not been in the installation business for over a year.

The telephone log of potential customers is not only tenuous and speculative evidence of damages, the testimony at trial demonstrates that it is not even necessarily indicative of potential installation projects—the purpose for which the Debtor introduced the telephone log at trial. Many of the calls noted clearly relate to potential material sales.[65] The Debtor also noted that some of the calls that appear to relate to installation inquiries might actually relate to warranties for past installations.[66] Therefore, the Court finds that

---

**64.** No evidence was presented on the reasons why the Leal and Tovar Contracts were cancelled prepetition.

**65.** Trial Transcript, Vol. I, at 33:7–34:22.

**66.** Trial Transcript, Vol. I, at 63:23–65:1.

the telephone log is not sufficiently persuasive evidence with respect to the losses the Debtor may have sustained from being unable to service installation requests postpetition.

Finally, all of the evidence presented by the Debtor must also be considered in light of the fact that the delay caused by the Defendants in the reinstatement of the Debtor's license lasted only twenty-four days. While this is not insignificant, it does limit the time period for which the Debtor may claim operational damages.

Weighing all the evidence presented by the Debtor, the Court finds that the Debtor has failed to meet his burden of proof. Notwithstanding the violation of the automatic stay by the Defendants, the Debtor has failed to prove he sustained any actual damages to his business operations.

## 2. Attorneys' Fees and Costs

However, the above analysis does not necessarily mean that the Debtor cannot recover for his attorneys' fees and costs. A debtor's actual damages under 362(h) also explicitly includes costs and attorneys' fees. The Debtor argues that even if the actual damages incurred by the debtor are only his or her attorneys' fees for enforcing the terms of the automatic stay, an award of such attorneys' fees to the debtor is mandatory.[67]

In *Roman,* the Ninth Circuit Bankruptcy Appellate Panel endorsed the use of the principles used in Bankruptcy Code § 330 as a guide for awarding attorneys' fees under Bankruptcy Code § 362(h). The *Roman* Panel also noted that there is a consensus in the case law that, under § 362(h), the Bankruptcy Court must also examine whether the debtor could have mitigated the attorney

fee damages. "Generally, in determining the appropriate amount of attorneys' fees to award as a sanction, the court looks to two factors: '(1) what expenses or costs resulted from the violation and (2) what portion of those costs was reasonable, as opposed to the costs that could have been mitigated.'" *Roman,* 283 B.R. at 12 (citations omitted).

The Debtor argues that the first factor in determining reasonableness of the debtor's attorneys' fees is to ascertain whether the creditor of the debtor created the injury. *Roman,* 283 B.R. at 14. On this issue, the Debtor notes that the creditor has the burden both to establish administrative safeguards to prevent stay violations and to restore the status quo by undoing them. *Id.* The Debtor also notes:

> The State continues to this moment in denying that it had any obligation to honor the automatic stay. EDD Post Trial Brief, page 4, lines 2–24. The record shows that the license was not reinstated until service of the complaint and motion for a TRO were served on the State. No more need be said about the need to bring this action and to take it to trial in the face of governmental intransigence.

Plaintiff's Post Trial Reply Brief at 4:27–5:3.

There is one additional provision relating to the award of attorneys' fees which has not been addressed by the parties—the Court's ability to award attorneys' fees and costs against a State agency. This issue is addressed by Bankruptcy Code § 106(a)(3), which provides:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to

---

**67.** *In re Taylor,* 884 F.2d 478, 483 (9th Cir. 1989), *In re Walsh,* 219 B.R. 873 (9th Cir. BAP 1998).

the extent set forth in this section with respect to the following:

> (3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

The problem with the Debtor's arguments in favor of an award of attorneys' fees and costs in this case is that no evidence has been submitted by the Debtor on this issue. Without such evidence, it is impossible for the Defendants or the Court to determine "(1) what expenses or costs resulted from the violation and (2) what portion of those costs was reasonable, as opposed to the costs that could have been mitigated.'" *Roman,* 283 B.R. at 12 (citations omitted). For this reason, to the extent that the Debtor still wishes the Court to consider an award of his attorneys' fees and costs, the Debtor's counsel is hereby directed to file with the Court, and serve on the Defendants a declaration containing a detailed accounting of her fees and costs.

A further potential complication for the Court's consideration of whether attorneys' fees and costs should be awarded is the issue of whether the equities would preclude an award of attorneys' fees in this case. The Court did not need to reach the question of the equities or "unclean hands" with respect to the Debtor's claim for actual damages arising from his business operations. However, such an inquiry, may or may not be relevant with respect to the potential award of the Debtor's attorneys' fees and costs. If the equities were to preclude the Debtor from recovering damages, does that necessarily preclude an award of attorneys' fees under 362(h)? Even if the Debtor ultimately failed to prove any actual damages to his business operations, the Debtor still wanted his contractor's license reinstated. Therefore, the adversary proceeding was nonetheless necessary under the circumstances. There is no evidence that Debtor's counsel knew or should have known about the alleged "bad acts" which ultimately led to the revocation of the Debtor's contractor's license. Therefore, is it even appropriate for the Court to consider the "bad acts" and the underlying license issues in determining the reasonableness of the attorneys' fees and costs incurred, and whether those fees and costs could have been mitigated? On the other hand, the Debtor acknowledged under cross-examination at trial that he chose not to answer truthfully on the question regarding his criminal history on his application for a contractor's license. Trial Transcript, Vol. II, at 59:7–64:12. *Must* the Court consider such factors since an award of attorneys' fees and costs is still an award to the Debtor, even if indirectly?

The parties must be given a full opportunity to address these issues, and any other they may wish to raise after reviewing the Debtor's attorneys' fees and costs. For this reason, the Court cannot rule on the issue of attorneys' fees and costs at this time.

### 3. Punitive Damages

■ The Debtor also seeks punitive damages against the Defendants. Such damages against governmental units are expressly prohibited under 11 U.S.C. § 106(a)(3), quoted above. For this reason, the Debtor's request for punitive damages is denied. Further, even if such pu-

nitive damages were available, they are not appropriate under the facts of this case.

## III.

## *CONCLUSION*

For the above stated reasons, the Court finds that the Defendants, collectively, violated the automatic stay by failing to reinstate timely the Debtor's contractor's license upon receiving actual notice of his bankruptcy filing and request for reinstatement. However, the Debtor has failed to prove any actual damages arising from the operation of his business, and, therefore, shall not be awarded any damages on that basis. The Court also denies the Debtor's request for punitive damages.

The Court cannot, at this time, determine whether the Debtor should be awarded any attorneys' fees or costs as actual damages. The Court suggests that the parties may want to discuss settlement of this remaining issue at this juncture. If no settlement can be reached and the Debtor still wishes to pursue an award of attorneys' fees and costs, the Debtor's counsel must file and serve a declaration with support documentation that sets forth all of her fees and costs in detail, within sixty days of the entry of this Partial Decision. The Debtor should concurrently file and serve a Memorandum of Points and Authorities addressing the issues noted above by the Court, and setting forth such further arguments as the Debtor would like the Court to consider. The Defendants shall have seventeen days from the date of service of the Debtor's papers to file their responses. The deadline for the Debtor's reply shall be ten days after the deadline for the Defendants' responses. No further pleadings should be submitted. The Court will take the sole issue of attorneys' fees and costs under submission upon the filing of the Debtor's reply. The Court will schedule oral

argument only if the Court determines that such argument would likely be of assistance to the Court.

If the Debtor chooses not to further pursue an award of attorneys' fees and costs, after sixty days from the entry of this Partial Decision, the Court will issue an order consistent with this Partial Decision but also denying the Debtor's request for attorneys' fees.